See note to this case in 42 N. W. Rep. 244.— REP.

WHITNEY and another, Appellants, vs. TRAYNOR and others,
Respondents.

*February 23 — April 25, 1889.*

MORTGAGES: EVIDENCE: FRAUDULENT CONVEYANCES.  *(1) Assignment:*
    *Proof of consideration.   (2, 3) Evidence of transactions with*
    *" insane person:" Sufficiency of objection.  (4) Appeal: Accounts:*
    *Defective record.   (5) Homestead: Foreclosure sale.   (6) Appli-*
    *cation of payments: Executory contract: Rights of other creditors.*
    *(7, 8) Fraudulent conveyances: Lease and deed to mortgagee:*
    *Chattel mortgages.*

1. The assignee of a note and mortgage need not show the considera-
    tion of the assignment in an action for foreclosure.
2. A man over seventy years old who, through softening of the brain,
    has so far lost his mental faculties as to be entirely incapable of
    giving testimony in court or any coherent statement of past events,
    is an " insane person " within the meaning of sec. 4069, R. S.
    R. S. sec. 4971, subd. 7.
3. When a defendant commenced giving testimony as to personal
    transactions and communications with such insane person, a gen-

eral objection was interposed. Later the proof as to the mental condition of such person was introduced. Afterwards said defendant was recalled and asked to testify as to a statement made to him by said insane person. This was objected to, and the court then said that the testimony in regard to such conversations was all under objection, subject to the preliminary question of insanity. *Held*, that this showed that at some time during the trial a proper and effectual specific objection was made to all this class of testimony.

4. The account books which were in the trial court not being in the record, and there being no sufficient abstract of them to enable this court to review the accounts of the parties intelligently, that part of the judgment which determines the amount unpaid on a note and mortgage is affirmed.

5. A portion of mortgaged premises was the homestead of one of the mortgagees, who, as to most of the mortgage debt, was a mere surety. Such homestead being occupied by the heirs of such surety at the time of foreclosure, the same should be last sold on the foreclosure sale if any of the defendants so desire.

6. A general creditor cannot enforce specific performance of an executory agreement between his debtor and another creditor of the latter, for the application of future payments to a particular demand. A judgment obtained by such general creditor should not, therefore, be given precedence over a prior mortgage given by the debtor, merely because such mortgage would have been satisfied if an executory agreement between the mortgagor and mortgagee as to the application of payments had been carried out.

7. A mortgaged farm was leased to the mortgagee with the stipulation that the proceeds of the crops should be applied on the mortgage debt. The mortgagee obtained a tax deed of a part of the premises, and afterwards the mortgagor quitclaimed that part to him, but such deeds were not intended to and did not alter their relations as mortgagor and mortgagee. *Held*, that neither the lease nor the deeds were fraudulent as to other creditors of the mortgagor.

8. Fraudulent chattel mortgages covering all the personal property on a farm, given to the mortgagee of the farm itself, but having no connection with the mortgage of the realty, cannot affect the rights of the holders of the latter mortgage.

APPEAL from the Circuit Court for *Dodge* County.

This action was commenced May 18, 1887, and was brought to foreclose a mortgage executed October 23, 1871,

to Henry A. Whitney, by the defendant *Ody W. Traynor*, and by his father and mother, Phillip and Elizabeth Traynor, to secure the payment of a promissory note of the same date for $2,700, and ten per cent. interest, made by the said *Ody W. Traynor* to said Henry A. Whitney. The mortgage covers 145 acres of land, forty acres of which was the homestead of Phillip Traynor, and the residue belonged to *Ody W.* The plaintiffs, *Alonzo H. Whitney* and *John J. Sutton*, claim to be the assignees and owners of such note and mortgage. Phillip and Elizabeth Traynor both died intestate before this action was commenced, and all of the other defendants, except *Eugene S. Griswold*, are their heirs or the husbands of their heirs. The defendant *Griswold* claims an interest in the land covered by the mortgage, except such homestead, under a judgment recovered by him against *Ody W. Traynor*, March 8, 1887, and a sale thereof made May 25, 1887, to said *Griswold*, by virtue of an execution issued on such judgment.

The complaint is in the usual form of complaints in such actions. The defendants *Ody W. Traynor* and *Griswold* answered separately, both alleging that the note and mortgage had been fully paid. The heirs answered an agreement between *O. W. Traynor* and H. A. Whitney, alleged to have been made when the mortgage was executed, that when $700 should be paid on the note Whitney would release the homestead of Phillip Traynor from the lien of the mortgage.

A trial of the cause resulted in findings (among others) that there was due and unpaid on the note and mortgage $2,021.32, and interest thereon at ten per cent. from April 22, 1878. This sum is less than is claimed in the complaint. Also that the homestead of Phillip Traynor should be discharged from the lien of the mortgage, and that the interest of the defendant *Griswold* in the 105 acres by virtue of the lien of his judgment and the execution sale is para-

mount to the lien of the plaintiff's mortgage. The court also awarded costs to *Griswold* against the plaintiffs.

Judgment having been entered pursuant to such findings, the plaintiffs appeal from the portions thereof which adjudge (1) that the amount due on the mortgage debt is less than is claimed in the complaint; (2) that the homestead forty be released from the lien of plaintiff's mortgage; and (3) that the interest of *Griswold* in the 105 acres is paramount to the lien of such mortgage; also from the award of costs to *Griswold*.

The findings of the circuit court are very voluminous, and it is unnecessary to state them in detail. Sufficient reference is made to them in the opinion, as well as to the evidence, to give a correct understanding both of the findings and evidence so far as they affect the questions presented for determination by this appeal.

For the appellants there was a brief by *G. J. Cox*, and the cause was argued orally by *Mr. Cox* and *I. C. Sloan*.

For the respondents there was a brief by *Lander & Lander, J. M. Olin*, and *W. G. Coles*, and a separate brief by *J. M. Olin*, and the cause was argued orally by *H. W. Lander* and *J. M. Olin*. To the point that neither the mortgagor nor the mortgagee could change the application of the proceeds of the crops as made in the leases, they cited Munger on Application of Payments, 23, 70; *Marvin v. Vedder*, 5 Cow. 671; *Truscott v. King*, 6 N. Y. 147–63; *Thayer v. Denton*, 4 Mich. 192; *Sheldon v. Bennett*, 44 id. 634; *Thompson v. Hudson*, 6 Ch. App. Cas. 320; *Miles v. Ogden*, 54 Wis. 573.

LYON, J.    I. Some questions affecting to a greater or less extent all of the propositions hereinafter discussed will first be considered.

1. It is objected by counsel for the defendants that the plaintiffs have failed to show that they are the owners of

the note and mortgage in suit, and hence that they cannot maintain this action. The securities were assigned by Henry A. Whitney, the mortgagee, to the plaintiff *Alonzo A. Whitney*, who afterwards, and before the commencement of this action, assigned a one-half interest therein to the plaintiff *John J. Sutton*. The testimony tends to prove that each of these assignments was made for a valuable consideration. But this is immaterial. It was competent for the mortgagee to donate the securities to his son, the plaintiff *Whitney*, and for the latter to donate a one-half interest therein to *Sutton*, if they chose to do so. Hence the assignments are valid, whether made upon or without consideration, and vested the title to the securities in the plaintiffs. Payment of the mortgage debt to them is good as against all the world. The objection is not well taken.

But these assignments were made long after the debt became due, and hence the plaintiffs are entitled to no other or greater relief than the mortgagee would have been entitled to had the assignments not been executed, and were he, instead of his assignees, the plaintiff in the action.

2. The defendant *Ody W. Traynor* testified on the trial as a witness in his own behalf and in behalf of his codefendants. He was allowed, under objection, to testify in chief to a great number of transactions and communications had by him personally with Henry A. Whitney. Such testimony was adverse to the plaintiffs on all the issues in the case. It appears by the testimony of two physicians and other witnesses that for some months before the trial Henry A. Whitney was afflicted with softening of the brain, and constantly grew worse. He was over seventy years of age, and his disease was incurable. At the time of the trial it had progressed so far that his memory was nearly gone, and he was unfit to do any kind of business. Within two weeks of the trial he fell into a comatose state, and remained unconscious sixteen hours. After consciousness

returned he talked incoherently. Dr. Earll testified that he was demented, and gave facts and circumstances which abundantly establish the accuracy of his statement. *Dementia* is or may be insanity. It is indisputable that, by reason of the loss of his mental faculties, Henry A. Whitney was then entirely incapable of giving testimony in court or any coherent statement of past events. Clearly he was *non compos mentis*, within the medical signification of the term. Hence he was insane within the statutory definition: "The words 'insane persons' shall be construed to include every idiot, *non compos*, lunatic, and distracted person." R. S. sec. 4971, subd. 7. The fact of his insanity was scarcely questioned; indeed, it was practically admitted by the learned counsel for the defendants in the argument of the case.

Sec. 4069, R. S., so far as the same is here applicable, provides that "no party . . . shall be examined as a witness in respect to any transaction or communication by him personally . . . with a person then insane, in any civil action or proceeding in which the opposite party derives his title . . . to the cause of action from, through, or under . . . such insane person." The section contains other provisions, and certain exceptions not important here. The testimony of *Ody W. Traynor* above mentioned contravenes this rule. Such testimony should have been disregarded by the circuit court, and must be disregarded by this court in determining the case.

It was argued, however, by one of the counsel for defendants, that no sufficient objection was made to the admission of such testimony. A general objection was interposed thereto when *Ody W. Traynor* commenced giving testimony of this character. Later in the trial the testimony as to the mental condition of Henry A. Whitney was introduced. Then *Ody W. Traynor* was recalled and asked by his counsel to give a statement of what Henry A. Whitney

said to him on a certain subject. This was objected to, and the court said: "The testimony with regard to conversations with Whitney is all under objection, subject to the preliminary question of insanity." This shows that at some time during the trial a proper and effectual specific objection was made to all this class of testimony, and sufficient exceptions were taken to its admission.

3. The question whether the court adjudged too large a sum unpaid on the mortgage debt cannot be considered on the plaintiffs' appeal. The defendants must be deemed satisfied with the judgment in that behalf, unless they, or some of them, appeal therefrom.

II. We will now consider in their order the specific portions of the judgment from which this appeal is taken.

' 1. The plaintiffs claim that the sum adjudged unpaid on the note and mortgage should be increased several hundred dollars. The court found upon sufficient evidence that on April 22, 1878, *Ody W. Traynor* and Henry A. Whitney accounted together and settled all their accounts and transactions from the date of the securities to that time, and found a balance due Whitney on such settlement of $2,040.05. Of this sum, $1,040 was then indorsed on the note. It appears that Whitney then gave *Traynor* his check for $1,000, the proceeds to be paid to other creditors of *Traynor*, including *Griswold*. *Traynor* succeeded in obtaining an extension from such creditors, and in June following returned the check to Whitney, and the amount thereof was thereupon indorsed upon the note. The circuit court surcharged the account by crediting *Traynor* with $393.63 additional. The amount adjudged unpaid on the securities was obtained by allowing *Traynor* credit as of April 22, 1878, on the amount then unpaid on the note, principal and interest, the sum of $2,434.58, and computing interest on the balance at ten per cent. to May 8, 1888; that being the date of the findings and judgment. Al-

though *Traynor* had credits with Whitney after April 22, 1878, the court must have found that these were absorbed in other ways and no part thereof was applicable to the payment of the mortgage debt. This was favorable to the plaintiffs, and is not reviewable on this appeal.

We have not in the record the account books of the parties upon which such settlement was made, and no sufficient abstract of them to enable us to review their accounts intelligently. There is no exhibit showing the items of the mortgagee's account. Moreover, the testimony is voluminous and confused, and, without the books or proper abstracts of them, much of it is practically unintelligible. The learned circuit judge had the accounts and books before him, and was in a much·better position to review the accounts and ascertain the true balance than we are. The imperfect record before us furnishes no safe basis for judgment on this branch of the case, and we are compelled to affirm that part of the judgment of the circuit court which determines the amount unpaid on the note and mortgage.

2. The circuit court found and adjudged that, as to the homestead of Phillip Traynor, the mortgage was satisfied and had ceased to be a lien thereon. The whole consideration for the note and mortgage, except about $150, was the indebtedness of *Ody W. Traynor* to Henry A. Whitney; the $150 was a debt owing to the latter by Phillip Traynor. It does not appear that Phillip made any payment on the mortgage debt. *Ody W. Traynor* testified to an oral agreement between himself and the mortgagee to the effect that when $700 should be paid on the debt Whitney should release the homestead of Phillip from the lien of the mortgage. There is no other testimony to that effect. The finding and judgment that the homestead should be so released are only sustained by this testimony. But, having determined that the testimony is inadmissible and must be disregarded, there is no sufficient basis for the judgment in

this particular. It must be held, therefore, that the mortgage remains a lien upon such homestead. It may be observed, however, that because Phillip Traynor was a surety for *Ody W. Traynor* for most of the mortgage debt, and because (as the circuit court found) the heirs of Phillip still occupy the land as their homestead, the same should be last sold on the foreclosure sale, if any of the defendants so desire. *Hanson v. Edgar*, 34 Wis. 653; *Smith v. Wait*, 39 Wis. 512.

3. The next question is, Was the lien of the mortgage in suit properly postponed to that of *Griswold's* judgment, recovered against *Ody W. Traynor* in 1887? When the securities were executed it was agreed between the mortgagee and *Ody W. Traynor* that the latter should lease the mortgaged premises to the mortgagee, and give him the benefit of all crops raised thereon for two years ensuing; the proceeds of such crops to be applied to the payment of the debt secured by the mortgage. On November 22, 1871, such a lease was executed, containing the agreed stipulations. Similar instruments were executed by the parties from time to time, so that all the crops raised on the mortgaged land down to the commencement of this action, and later, were subject to such disposition. Nearly one half of the proceeds of such crops were applied by Whitney, with the consent and solicitation of *Ody W. Traynor*, to the payment of a running account for merchandise purchased by him of Whitney, and to reimburse Whitney for money paid by him to satisfy numerous demands of other creditors of *Traynor*. It is manifest that this diversion of the proceeds of the crops from the purpose originally agreed upon commenced as soon as any crops were received by Whitney (perhaps before), and was in pursuance of a mutual and continuing agreement between Whitney and *Traynor*, affecting all such proceeds. Hence there was no actual application of such proceeds to the payment of the mortgage

debt until the indorsements of 1878 were made upon the note, and then only to the amount of such indorsements. Until that time the original agreement to apply such proceeds upon the mortgage debt remained executory.

The court found that the whole value of the crops received by Whitney under these leases and agreements, down to April 22, 1878 (the date of the settlement before mentioned), was equal to or exceeded the amount then due upon the mortgage debt, and held that although *Ody W. Traynor* consented to a different application of the crops, and was bound thereby, yet *Griswold* could insist that, as to him, the whole of such proceeds should be applied in accordance with the stipulations of the leases. On this ground the lien of the mortgage was postponed to that of *Griswold's* judgment. *Griswold* was a general creditor of *Ody W. Traynor* from the date of the securities until he recovered his judgment, in 1887. They seem to have had quite extensive dealings during all that time, or at least to 1885, but there was always a balance against *Traynor* of from $700 to $1,000 and more. At some times *Griswold* had security for *Traynor's* debt, and at others little or none. He testified that at one time, in 1878, he was pretty well secured for such indebtedness. *Griswold's* judgment recovered in 1887 against *Traynor* was for $1,139.39.

For the purposes of this case, it may be assumed that, when an application of a payment by a debtor has once been made upon a particular debt, the parties thereto cannot recall the application and apply such payment to another purpose, to the injury of another creditor, even though such other is only a general creditor of the debtor. But we have been referred to no adjudicated case which holds that a general creditor can enforce specific performance of an executory agreement between his debtor and another creditor of the latter, for the application of future payments to a particular demand. We do not think the law

permits any interference by such general creditor, if the parties to the payment see fit to make a different application of it before the same is actually applied pursuant to the original agreement between them. If any case holds the contrary, we have failed to find it. The most of the cases cited by the learned counsel for the defendants are cases in which the payment had been actually applied, and a change in the application thereof would affect injuriously sureties or joint debtors or subsequent incumbrancers who were such when the change was made. We have here no such case. We conclude, therefore, that the circuit court erred in postponing the lien of the mortgage in suit to the lien of *Griswold's* judgment, and also in awarding costs to him against the plaintiffs.

4. The circuit court found that certain transactions between Henry A. Whitney and *Ody W. Traynor* were fraudulent as against the creditors of the latter. It is not clear that this finding affected the judgment in respect either to the homestead or the priority of *Griswold's* lien over that of the mortgage. It may, however, have influenced the judgment in these particulars, and hence a brief consideration of this finding will not be out of place.

At the time the first lease above mentioned was executed by *Traynor* to Whitney (November 22, 1871), *Traynor* also executed to Whitney a note for $500, and a chattel mortgage on all his personal property on the farm to secure the note. This mortgage was filed in the proper office, and was continued in force another year by annexing thereto, November 22, 1871, the affidavit required by statute. December 4, 1873, *Traynor* executed another chattel mortgage to Whitney on all the personal property then on his farm, to secure the same note. A chattel mortgage was also executed by *Traynor* to Whitney, January 7, 1884, covering all his personal property, and purporting to secure a note for $510. There was no consideration for any of

these notes and chattel mortgages, and it must be conceded that they were fraudulent and void as against existing creditors of *Traynor*. Had any such creditor seized the mortgaged property on attachment or execution for his demand, he would undoubtedly have held the same as against Whitney.

In September, 1873, Henry A. Whitney obtained a tax deed of the 105 acres of the mortgaged land owned by *Ody W. Traynor*, with the consent of the latter, and during the next month *Ody W. Traynor* executed to Whitney a quitclaim deed of the same land. But, under the agreement between Whitney and *Traynor* with respect thereto, such deeds were not intended by them to interfere with their relations to each other as mortgagor and mortgagee of the land, and did not so interfere. The mortgage relation was kept alive by mutual agreement, under which the only effect the deeds could have was to create between them the relation of equitable mortgagor and mortgagee. Such change could not possibly affect the rights of *Traynor's* creditors.

The finding above mentioned is that such leases, chattel mortgages, tax deed, and quitclaim deed were executed and received by Whitney and *Traynor*, respectively, for the purpose of covering the property of *Traynor*, and to hinder, delay, cheat, and defraud his other creditors. There was no element of fraud in the leases or deeds. A mortgagee may lawfully stipulate for the possession of the mortgaged premises, or that the crops grown thereon shall be delivered to him and the proceeds applied to the mortgage debt. As already suggested, the tax deed and quitclaim deed could harm no one. What interest could it be to *Griswold* or any other creditor of *Traynor* whether Whitney or *Traynor* held the legal title to the mortgaged premises, so long as the relation of mortgagor and mortgagee, theretofore existing between them, continued? These deeds

neither interfered with the enforcement of the rights, nor impaired the remedies, of any other creditor of *Traynor*. The competent testimony in the case fails to show any intention by Whitney, when he took such leases and deeds, to do more than to obtain ample security for his debt, and this he had a legal right to do.

The chattel mortgages were fraudulent, but there is no connection between them and the mortgage in suit. There is no competent proof that they had ever been suggested or thought of when the real-estate mortgage was executed and the agreement for the leases made. The creditors of *Traynor* could have successfully resisted them, but the right of the plaintiffs to enforce the lien of their mortgage cannot possibly be affected by them.

*By the Court.*— Those portions of the judgment which release the former homestead of Phillip Traynor from the lien of the mortgage in suit, and which postpone the lien of such mortgage to that of *Griswold's* judgment, and which award costs to the latter against the plaintiffs, are reversed. The cause will be remanded to the circuit court for further proceedings according to law.